ORIGINAL

FILED IN CHAMBERS
U.S.D.C Atlanta

MAR 22 2011

JAMES N. HATTEN, Clerk
By: Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | CRIMINAL INDICTMENT |
| v. | : | |
| | : | NO. 1:11-CR-127 |
| LAWRENCE EPPELBAUM | : | |

The Grand Jury charges that:

## COUNTS ONE THROUGH TWELVE
(Scheme to Defraud a Federal Health Care Benefit Program)

1. From in or about 2004, and continuing through in or about December 2009, in the Northern District of Georgia and elsewhere, Defendant LAWRENCE EPPELBAUM, together with others known and unknown, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud the Medicare Program ("Medicare"), which is a health care benefit program, as defined in Title 18, United States Code, Section 24(b), affecting interstate commerce, to obtain money from Medicare by means of materially false and fraudulent pretenses, representations, and promises, in connection with the delivery of and payment for health care benefits, items, and services, as set forth below.

## Background

At all times relevant to this Indictment:

2.  Medicare is a federal health care program providing benefits to persons who are over the age of 65 or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b). Medicare also is a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f). Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

3.  "Part B" of the Medicare program covers certain outpatient services and medical care provided by a physician. Defendant LAWRENCE EPPELBAUM's services were submitted to Medicare for payment under Part B of the program.

4.  Payments under the Medicare program are often made directly to a provider of the goods or services, rather than to the beneficiary. This occurs when the provider accepts assignment of the right to payment from the beneficiary. In that case, the provider submits the claim to Medicare for payment, either directly or through a billing company.

5. Physicians and other health care providers that provide services to Medicare beneficiaries are able to apply for and obtain "provider numbers." In the application, the provider acknowledges that to be able to participate in the Medicare program, the provider must comply with all Medicare related laws and regulations. A health care provider who is issued a Medicare provider number is able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

6. After obtaining a provider number, the physician then submits or causes the submission of claims to an entity that processes those claims for CMS. In order to bill the Medicare Program for services rendered, physicians and other health care providers submit a claim form to a Medicare intermediary who processes the claim. When a claim form is submitted, usually in electronic form, the provider certifies that the contents of the form are true, correct, complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare Program.

7. A Medicare claim is required to set forth, among other things, the beneficiary's name and Medicare identification number, the equipment or medicine provided to the beneficiary, the date the equipment or medicine was provided, the cost of the equipment or medicine, and the name and provider identification number of the physician who provided the services or prescribed the equipment or medicine.

8. Defendant LAWRENCE EPPELBAUM is a physician who is licensed to practice medicine in Georgia and owns and operates Atlanta Institute of Medicine and Rehabilitation ("AIMR") and the Pain Clinic of AIMR in Atlanta. AIMR and the Pain Clinic of AIMR are Georgia corporations, doing business at 2915 Piedmont Road in Atlanta, Georgia. Among other things, AIMR and the Pain Clinic of AIMR provide physician services and pain treatment to Medicare beneficiaries.

9. Defendant LAWRENCE EPPELBAUM, AIMR and the Pain Clinic of AIMR are authorized Medicare providers that are permitted to submit claims to Medicare in order to be reimbursed for the cost of health care services provided to Medicare beneficiaries.

10. The Medicare anti-kickback statute prohibits offering and paying remuneration, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to purchase, order and arrange for the purchasing, leasing, and ordering of a good, facility, service, or item for which payment may be made under Medicare or any other federal health care benefit program. The law provides a safe harbor provision for certain types of charitable arrangements. In order to meet this safe harbor, however, the arrangement must meet seven individual criterion.

11. In or about 1999, Defendant LAWRENCE EPPELBAUM submitted a Medicare enrollment application on behalf of AIMR. In that application, he certified that:

> I am familiar with and agree to abide by the Medicare or other federal health care program laws, regulations and program instructions that apply to my provider/supplier type. The Medicare laws, regulations, and program instructions are available through the Medicare Contractor. I understand that payment of a claim by Medicare or other federal health care programs is conditioned on the claim and the underlying transaction complying with such laws, regulations and program instructions (including the anti-kickback statute and the Stark law), and on a provider/supplier being in compliance with any applicable conditions of participation in any federal health care program.

Defendant LAWRENCE EPPELBAUM made similar representations when he submitted Medicare enrollment applications on his own behalf and on behalf of the Pain Clinic of AIMR.

### Description of the Scheme

12. In or about 2004, Defendant LAWRENCE EPPELBAUM created the Back Pain Fund ("BPF"). The BPF is not separately incorporated and is not itself a charitable tax-exempt entity as that term is defined under federal law. The BPF does not have a board of directors or other managing body, but is managed, operated and directed by Defendant LAWRENCE EPPELBAUM, both directly and indirectly. In or about 2005, Defendant LAWRENCE EPPELBAUM caused the BJCC of Atlanta,

5

Similarly, no other physicians outside of AIMR provided medical care to the patients participating in the program or billed for the medical services rendered to them. From 2004 through 2009, Defendant LAWRENCE EPPELBAUM treated hundreds of BPF patients and reimbursed approximately $15 million by Medicare for their treatment.

16. In 2005, Defendant LAWRENCE EPPELBAUM approached a Jewish Day School, seeking to enlist its help. Pursuant to an arrangement with the school, parents, whose children attended the Jewish Day School and paid tuition, would "donate" their monthly tuition payments to the BPF. In turn, defendant LAWRENCE EPPELBAUM and his clinics "donated" an equal amount to the Jewish Day School, plus an additional 25 percent.

17. The additional 25 percent constituted a windfall for the Jewish Day School. In turn, Defendant LAWRENCE EPPELBAUM was able to disguise his funding of the BPF. Defendant LAWRENCE EPPELBAUM had similar arrangements with a synagogue and ASK, a program affiliated with the synagogue.

18. At AIMR and the Pain Clinic of AIMR, Defendant LAWRENCE EPPELBAUM allowed patients to "donate" their co-payments for medical services rendered at the clinic to the BPF. In return, Defendant LAWRENCE EPPELBAUM's staff at AIMR provided charitable receipts to patients from the BPF.

7

a tax-exempt, charitable entity, to open a checking account in the name of the BPF.

13. Pursuant to the scheme, the BPF would fly Medicare patients free of charge to Atlanta from other states to receive medical treatment. While in Atlanta, the Medicare patients were seen by Defendant LAWRENCE EPPELBAUM at AIMR and the Pain Clinic of AIMR and would receive a series of injections and other tests. The professional and technical fees for these services then were billed to Medicare under Part B.

14. After receiving treatment, the patients traveled to Florida or North Carolina for a visit to a local hot spring free of charge. After approximately four days at the hot spring, patients returned to Defendant LAWRENCE EPPELBAUM's clinics and received another series of injections, tests and medical care that were billed to Medicare. During a recorded telephone call, Defendant LAWRENCE EPPELBAUM explained that it was simply more convenient to send patients to Florida because the second series of shots could be done no sooner than a week after the first series. He explained that the "old people" need to be kept somewhere for a certain time. All of the Medicare patients' expenses, including their meals, lodging, travel expenses and the trips to Florida and North Carolina, were paid for by the BPF.

15. Either directly or indirectly, Defendant LAWRENCE EPPELBAUM was the primary donor to the BPF, paying the vast majority of its operating expenses.

19. Defendant EPPELBAUM derived substantial income from treating patients from the BPF. During the period of the scheme, Defendant LAWRENCE EPPELBAUM billed Medicare approximately $15 million dollars relating to the treatment of BPF patients.

## Execution of the Scheme

20. On or about the dates set forth below, within the Northern District of Georgia and elsewhere, Defendant LAWRENCE EPPELBAUM knowingly and willfully executed and attempted to execute the above-described scheme and artifice to defraud the Medicare Program, a health care benefit program as defined in Title 18, United States Code, Section 24(b), affecting interstate commerce, and to obtain money from the Medicare Program by means of materially false and fraudulent pretenses, representations, and promises, in connection with the delivery of and payment for the health care benefits, items, and services set forth below:

| Count | Approximate Date of Service | Patient | Service Type |
|---|---|---|---|
| 1 | May 30, 2006 | M.Z. | Motor Nerve Conduction Test |
| 2 | May 30, 2006 | R.Z. | Caloric Vestibular Test |

| 3 | April 19, 2007 | Z.Z. | Injection Paravertebral |
| 4 | October 25, 2007 | M.T. | Extracranial Study |
| 5 | October 27, 2007 | L.G. | H Reflex Test |
| 6 | March 28, 2007 | L.M. | Injection Paravertebral |
| 7 | January 16, 2008 | T.B. | Comprehensive Hearing Test |
| 8 | March 4, 2008 | E.S. | Caloric Vestibular Test |
| 9 | August 6, 2008 | E.N. | Electrocardiogram |
| 10 | October 31, 2008 | M.G. | Ketorolac Tromethamine Injection |
| 11 | April 8, 2009 | T.U. | Sense Nerve Conduction Test |
| 12 | April 8, 2009 | V.B. | Rhythm ECG With Report |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS THIRTEEN - SEVENTEEN
### (Offering Kickbacks Involving a Federal Health Care Program)

21. Paragraphs 2 through 19 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

22. On or about the dates enumerated below, within the Northern District of Georgia and elsewhere, Defendant LAWRENCE EPPELBAUM, together with persons known and unknown, knowingly offered and paid remuneration, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to purchase, order and arrange for the purchasing, leasing, and ordering of a good, facility, service, and item for which payment may be made in whole or in part under a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f), affecting interstate commerce, specifically, Medicare:

| Count | Approximate Date | Remuneration | Payee |
|---|---|---|---|
| 13 | November 3, 2006 | Payment of approximately $7,000 | Alve Travel |
| 14 | April 29, 2009 | Payment of approximately $1,386.72 | Club 455 |
| 15 | May 1, 2009 | Payment of approximately $5,120.49 | Holiday House |
| 16 | May 5, 2009 | Payment of approximately $1,258.32 | Club 455 |
| 17 | May 5, 2009 | Payment of approximately $1,386.72 | Club 455 |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2), and Title 18, United States Code, Section 2.

## COUNT EIGHTEEN
### (Obstructing and Impeding the Internal Revenue Laws)

23. Beginning in or around 2004, and continuing until and including on or about October 15, 2009, in the Northern District of Georgia and elsewhere, Defendant LAWRENCE EPPELBAUM, did corruptly endeavor to obstruct and impede the due administration of the internal revenue laws.

### Description of the Scheme

24. Paragraphs 2 through 19 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

25. On or about September 7, 2007, Defendant LAWRENCE EPPELBAUM and his spouse filed a joint federal income tax return for the year 2006 that reported $696,571 in deductible gifts to charity by cash or check, including payments made, directly and indirectly, for the benefit of the BPF. Defendant LAWRENCE EPPELBAUM knew that payments he and his spouse made for the benefit of the BPF did not qualify as charitable deductions because Defendant LAWRENCE EPPELBAUM derived substantial personal income from treating BPF patients in 2006.

26. On or about October 2, 2008, Defendant LAWRENCE EPPELBAUM and his spouse filed a joint federal income tax return for the year 2007 that reported $993,498 in deductible gifts to charity by cash or check, including payments made, directly and indirectly, for the benefit of the BPF. Defendant LAWRENCE EPPELBAUM knew that payments he and his spouse made for the benefit of the BPF did not qualify as charitable deductions because Defendant LAWRENCE EPPELBAUM derived substantial personal income from treating BPF patients in 2007.

27. On or about October 14, 2008, Defendant LAWRENCE EPPELBAUM and his spouse received notice that the IRS was initiating a civil audit of their 2006 joint federal tax return, specifically their reported gifts to charity. On or about October 31, 2008, Defendant LAWRENCE EPPELBAUM requested that the Jewish Day School provide a contribution letter for his payments to the school during 2006 that did not disclose the value of any goods or services he received in exchange for those payments. Defendant LAWRENCE EPPELBAUM specifically requested that the Jewish Day School make no mention in its contribution letter about the relationship between payments made by or on behalf of the Jewish Day School to the BPF in return for an equal amount plus an additional 25 percent that Defendant LAWRENCE EPPELBAUM paid to the Jewish Day School. The Jewish Day School

complied with his request, and Defendant LAWRENCE EPPELBAUM caused this contribution letter to be submitted to the IRS as purported substantiation for the gifts to charity reported on Defendant LAWRENCE EPPELBAUM's 2006 joint federal income tax return.

28. On or about October 15, 2009, Defendant LAWRENCE EPPELBAUM and his spouse filed a joint federal income tax return for the year 2008 that reported $1,268,271 in deductible gifts to charity by cash or check, including payments made, directly and indirectly, for the benefit of the BPF. Defendant LAWRENCE EPPELBAUM knew that payments he and his spouse made for the benefit of the BPF did not qualify as charitable deductions because Defendant LAWRENCE EPPELBAUM derived substantial personal income from treating BPF patients in 2008.

29. During interviews with federal investigators on or about November 7, 2005 and September 18, 2006, Defendant LAWRENCE EPPELBAUM falsely claimed that he did not control the BPF, and that he was responsible for less than 30 percent of the donations to the BPF. Defendant LAWRENCE EPPELBAUM did not wish to disclose the dominion and control that he exercised over the BPF because of the substantial personal income that he derived from BPF patients.

30. Defendant LAWRENCE EPPELBAUM disguised his control over the BPF by making it falsely appear as if the BPF received donations from multiple sources, when in fact most of the payments to the BPF came directly and indirectly from him. For example:

    a. Defendant LAWRENCE EPPELBAUM arranged with the Jewish Day School to reimburse the school 100 percent, plus pay an additional 25 percent, for all payments made by or on behalf of the Jewish Day School to the BPF. As a result of this arrangement, the Jewish Day School made direct payments to the BPF, for which the Jewish Day School was reimbursed by Defendant LAWRENCE EPPELBAUM 125 percent. The Jewish Day School also caused some of the parents with students at the school to make their tuition payments directly to the BPF, for which the Jewish Day School was reimbursed by Defendant LAWRENCE EPPELBAUM 125 percent. The Jewish Day School also caused ASK, which rented a house from the Jewish Day School, to make its rental payments directly to the BPF, for which the Jewish Day School was reimbursed by Defendant LAWRENCE EPPELBAUM 125 percent. The payments made to the BPF from the Jewish Day School, its members, and ASK made it appear as if the BPF had multiple sources of donations, when in fact, the true source of all of these donations was Defendant LAWRENCE EPPELBAUM.

b. Defendant LAWRENCE EPPELBAUM caused some patients who owed money to AIMR and the Pain Clinic of AIMR for medical services rendered to make "donations" to the BPF in lieu of their co-payments to AIMR. In exchange for these "donations," the patients received a charitable contribution statement from the BPF, issued by the AIMR staff, which could be used to falsely substantiate the "donation" as a tax deduction. Providing these charitable contribution statements to patients of AIMR obstructed and impeded the due administration of the internal revenue laws by making it appear as if the patients had donated money to the BPF, when in fact, the payments were made in exchange for medical services rendered by AIMR and were not legitimate charitable donations. In addition, this arrangement made it appear as if AIMR's patients were additional sources of donations to the BPF, when in fact, the true source of all these donations was Defendant LAWRENCE EPPELBAUM.

c. Defendant LAWRENCE EPPELBAUM made payments to the BPF from three different bank accounts that he controlled, including his personal bank account and the business accounts of AIMR and the Pain Clinic of AIMR. Defendant LAWRENCE EPPELBAUM personally deducted all of the payments made from the three bank accounts as charitable contributions on his personal return, and also deducted the 125 percent reimbursement payments he made to the Jewish

Day School as charitable contributions. The payments made to the BPF from the business bank accounts of AIMR and the Pain Clinic of AIMR made it appear as if these entities were additional sources of donations for the BPF, when, in fact, the true source of all these donations was Defendant LAWRENCE EPPELBAUM.

31. Defendant LAWRENCE EPPELBAUM concealed from his tax return preparer for years 2006 through 2008, from federal investigators, and from the IRS the financial arrangement he had orchestrated between the Jewish Day School, ASK, a synagogue and the BPF, the dominion and control that he exercised over the BPF, and the financial benefit he derived from his "charitable donations" to these entities.

All in violation of Title 26, United States Code, Section 7212(a).

## COUNTS NINETEEN THROUGH TWENTY-ONE
(Tax Evasion)

32. Paragraphs 2 through 19 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

33. On or about the dates set forth below, in the Northern District of Georgia, Defendant LAWRENCE EPPELBAUM, did willfully attempt to evade and defeat a substantial part of the income tax due and owing by him and his spouse to the United States of America for the calendar years 2006 through 2008, by preparing and causing to be prepared, and by signing and causing to be signed, a false and

fraudulent joint U.S. Individual Income Tax Return, Form 1040, on behalf of himself and his spouse, which was filed with the Internal Revenue Service, as set forth below:

| Count | Date | Calendar Year Tax Return | Reported Taxable Income | Actual Taxable Income | Additional Tax Due and Owing |
|---|---|---|---|---|---|
| 19 | 9/7/07 | 2006 | $622,725 | $1,291,871 | $234,201 |
| 20 | 10/2/08 | 2007 | $1,712,546 | $2,698,044 | $344,924 |
| 21 | 10/15/09 | 2008 | $1,531,332 | $2,761,453 | $430,543 |

All in violation of Title 26, United States Code, Section 7201.

### Asset Forfeiture

34. The allegations of this Criminal Indictment are realleged and incorporated by reference for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 982.

35. Upon conviction of any of the offenses in Counts One through Twelve above, Defendant LAWRENCE EPPELBAUM shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(7), all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses set forth above in violation of Title 18, United States Code, Section 1347

17

36. The types of property which may be forfeited to satisfy the claim include, but are not limited to, the foregoing property, any property, real or personal, traceable to the foregoing property and any "substitute" property, as defined in Title 18, United States Code, Section 982(b), of a value equal to any and all assets identified specifically, which a) has or have been transferred, sold or deposited with a third party; b) which cannot be located by due diligence; c) which has or have been placed beyond the jurisdiction of this court; d) which has or have been substantially diminished in value; or e) which has or have been co-mingled with other property and cannot be divided without difficulty.

A _____TRUE_____ BILL

_____
FOREPERSON

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

KURT R. ERSKINE
ASSISTANT UNITED STATES ATTORNEY
Georgia Bar No. 249953

STEVEN D. GRIMBERG
ASSISTANT UNITED STATES ATTORNEY
Georgia Bar No. 312144

U.S. ATTORNEY'S OFFICE
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
404/581-6000